**IN THE
UNITED STATES DISTRICT COURT**

FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Civil Action No. 1:13-cv-00756-LY**

---

IN RE:
SCC KYLE PARTNERS, LTD.

WHITNEY BANK

Appellant,

v.

SCC KYLE PARTNERS, LTD.,
AND SETON FAMILY HOSPITALS
D//B/A SETON MEDICAL CENTER HAYS

Appellees.

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

**SUPPLEMENTAL REPLY BRIEF OF APPELLANT**

---

James G. Ruiz (SBN 17385860)
**WINSTEAD PC**
401 Congress Ave., Suite 2100
Austin, TX  78701
(512) 370-2800 Phone
(512) 370-2850 Fax
jruiz@winstead.com
*ATTORNEYS FOR APPELLANT
WHITNEY BANK*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ........ii

INTRODUCTION .................................................................................................................2

SUPPLEMENTAL REPLY ARGUMENT AND BRIEF OF AUTHORITIES ............................3

I.     Texas Supreme Court has addressed enforceability of charitable pledges and Texas
       law does not follow New York Law. ..................................................................................3

II.    SCC Kyle's rejection of the Charitable Pledge in the bankruptcy case extinguished
       any chance of an allowed claim under the Bankruptcy Code. ............................................5

III.   Bankruptcy law disfavors enforceability of charitable pledges and validity of
       charitable contributions...................................................................................................6

PRAYER...............................................................................................................................7

CERTIFICATE OF SERVICE .................................................................................................8

APPENDIX TO REPLY BRIEF OF APPELLANT ...................................................................9

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*City of Boerne v. Flores*,
    521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)............................................................7

*Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,*
    554 U.S. 33, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008)........................................................5

*Hilley v. Hilley,*
    342 S.W.2d 565 (Tex. 1961)................................................................................................3

*Hopkins v. Upshur,*
    20 Tex. 89 (Tex. 1857) .......................................................................................................3

*In re 375 Park Ave. Associates, Inc.,*
    182 B.R. 690 (Bankr. S.D.N.Y. 1995).................................................................................6

*In re Young,*
    82 F.3d 1407 (8th Cir. 1996)..............................................................................................6

*Weinman v. Word of Life Christian Ctr. (In re Bloch),*
    207 B.R. 944 (D. Colo. 1997).............................................................................................6

STATUTES

11 U.S.C. § 502(b)(1) ...........................................................................................................5

11 U.S.C § 548(d)(3)..........................................................................................................2, 7

Religious Freedom Restoration Act of 1993, 42 U.S.C. §2002bb, *et. seq.* .....................................7

Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No.
    105-183, 112 Stat. 518 (1998) .....................................................................................2,6,7

OTHER AUTHORITIES

143 CONG. REC. E2037 (daily ed. Oct. 21, 1997) ................................................................7

144 CONG. REC. S4769 (daily ed. May 13, 1998)..................................................................7

144 CONG. REC H29 (daily ed. June 13, 1998)......................................................................7

Rule 3002(c)(4).......................................................................................................................5

# IN THE
## UNITED STATES DISTRICT COURT

### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

### CIVIL ACTION NO. 1:13-CV-00756-LY

IN RE:
SCC KYLE PARTNERS, LTD.

WHITNEY BANK
APPELLANT,

v.

SCC KYLE PARTNERS, LTD.,
AND SETON FAMILY HOSPITALS
D//B/A SETON MEDICAL CENTER HAYS
APPELLEES.

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

## SUPPLEMENTAL REPLY BRIEF OF APPELLANT

---

Whitney Bank, successor by merger to Whitney National Bank, individually, and as agent for certain prepetition lenders (collectively "Whitney Bank") replies to the "Joint Brief of Appellees" filed by the Debtor, SCC Kyle Partners, Ltd. ("SCC Kyle") and presumptively, Seton Family of Hospitals d/b/a Seton Medical Center Hays ("Seton"), in this consolidated appeal case.

# INTRODUCTION

Appellees cite to no authority to support the claim Seton was a creditor of the bankruptcy estate under §502(a) entitled to an allowed claim. That aside, a charitable pledge is not enforceable under Texas law as a matter of public policy and the record establishes that there was not adequate consideration in exchange for the pledge or detrimental reliance by Seton or the Foundation. An analysis of the claim as arising from a rejected executory contract under § 365 highlights the lack of consideration for the pledge, i.e. SCC Kyle was not granted any naming rights and it received no public acknowledgement in exchange for the pledge. In addition, the actions that Appellees claim were done in reliance on the pledge all occurred before the pledge was made and thus cannot invoke the principles of promissory estoppel to justify enforcement of the charitable pledge.

In the context of a bankruptcy case, the general principle is that philanthropic actions "cannot be undertaken at the expense of a debtor's creditors. In fact, the treatment of charitable gifts and pledges by the bankruptcy courts has been so unfavorable that Congress passed the RELIGIOUS LIBERTY AND CHARITABLE DONATION PROTECTION ACT OF 1998 to provide some protections to charitable donations against avoidance actions in bankruptcy cases. This statutory protection, however, only applies to certain charitable contributions made by natural persons in chapter 7 and 13 cases, not limited partnerships in a Chapter 11 case. See 11 U.S.C § 548(d)(3). For such reasons, the bankruptcy court's ruling with respect to the claim filed by Seton should be reversed and the claim disallowed.

## SUPPLEMENTAL REPLY ARGUMENT AND BRIEF OF AUTHORITIES

### I.   *Texas Supreme Court has addressed enforceability of charitable pledges and Texas law does not follow New York Law.*

The Appellees do not challenge the Texas Supreme Court rulings in *Hopkins v. Upshur*, 20 Tex. 89, 94 (Tex. 1857), and *Hilley v. Hilley,* 342 S.W.2d 565, 575-76 (Tex. 1961), that hold charitable gifts without consideration are unenforceable in Texas. Instead, Appellees claim there was adequate consideration in exchange for the Charitable Pledge. SCC Kyle's suggestion that the donation helped it "secure the development partnership (and the Economic Incentive Agreements with the City and County) and provided public acknowledgement to SCC" is not supported by the record. *Appellees Brief at 3-4.*

First, the charitable pledge was made almost a year after the development agreement and Economic Incentive Agreements were entered into by the parties and therefore cannot be consideration for the agreements. Second, the agreements themselves do not provide for a binding charitable contribution as a condition to the agreements. Instead, the agreements expressly state there are no additional terms other than those expressly stated in the agreements. Parol evidence cannot modify the unambiguous terms of the agreements. Third, the basis of Seton's claim is not breach of the development agreement or Economic Incentive Agreements, but the unfulfilled pledge form which on its face states there is no consideration in exchange for the donation.

Likewise, Appellees' assertion that the reservation of naming rights or public acknowledgement for the pledge constitutes sufficient consideration is not supported by

3

the evidentiary record. First, SCC Kyle has not been granted any naming rights in exchange for the pledge to this date. Second, SCC Kyle failed to make the charitable donation in 2008 as promised and thus the Foundation intends to grant the naming rights to the first party that makes a $1 million donation. [R.R. 8/29/13 at 53:11-54:3]. Third, even if "public acknowledgement" could constitute valid consideration, Appellees can point to no "public acknowledgement" given to SCC Kyle in connection with the gift. Seton's and SCC Kyle's witnesses admitted SCC Kyle did not receive any public acknowledgement for the Charitable Pledge or the $500,000.00 contribution. [R.R. 8/29/13 at 14:11-14; 66:20-22].

As to claimed reliance on the Charitable Pledge, Appellees assertions that Seton incurred unspecified legal obligations and expenses and made the "prime" naming opportunity unavailable to others in reliance on the pledge finds no support in the record. Seton admitted it did not lose any donations as a result of the reservation of naming rights and intends to grant the naming rights to the first party who pays $1,000,000 to the Foundation. [R.R. 8/29/13 at 36:6-8; 53:24-54:3]. The financing for the hospital was in place before construction in 2008. [R.R. 8/29/13 at 37:4-15]. Thus, it is disingenuous to suggest that Seton borrowed the money in reliance of a pledge that was not even made yet. There is no question the Charitable Pledge was not economically beneficial to SCC Kyle, or that no benefit was received by SCC Kyle or the pre-petition or post-petition estate. Because there was no consideration in exchange for the charitable pledge and there was no reliance on the pledge on the part of Seton or the Foundation, the Seton claim is unenforceable under Texas law.

4

*II.*     ***SCC Kyle's rejection of the Charitable Pledge in the bankruptcy case
          extinguished any chance of an allowed claim under the Bankruptcy Code.***

Appellees address the issue concerning the executory nature of the Charitable

Pledge in a dismissive manner arguing that even if the pledge was rejected, Seton would

still had an unsecured claim for damages for breach of contract under § 365(g) and

Rule 3002(c)(4). *Appellees Brief at 10.* Appellees, however, fail to address whether any

such rejection claim under § 365(g) would be allowed under the Bankruptcy Code. It

would not because the claim would lack consideration. While it is understandable why

Appellees would like to skip over the executory contract issue in this appeal, the issue is

material to the Court's decision with respect to the allowance of the claim.

There is no dispute that if the Charitable Pledge was an executory agreement it

was rejected by operation of law because it was not assumed prior to confirmation of the

plan. *See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 128 S.Ct.

2326, 2335, 171 L.Ed.2d 203 (2008). Any rejection claim for the balance of the

unfulfilled pledge would not be allowed because as of the date the reorganization plan

was confirmed, SCC Kyle had not been granted the naming rights to the grand entrance

and lobby of a Seton facility, and received no public acknowledgement or other publicity

in connection with the pledge. In essence, as the pledge forms states on its face, SCC

Kyle received nothing in exchange for the monies donated to the Foundation. Therefore

the unsecured claim would not be enforceable and would be denied under 11 U.S.C.

§ 502(b)(1) because there was no consideration received by SCC Kyle or the bankruptcy

estate in exchange for the pledge.

### III. Bankruptcy law disfavors enforceability of charitable pledges and validity of charitable contributions.

Appellees make the bald statement that the *Allegheny* decision is "a seminal opinion in this area that is cited and relied upon in numerous jurisdictions." *Appellees Brief at 4 n. 2.* Like Texas, bankruptcy courts are another jurisdiction that do not cite or follow *Allegheny* in determining the validity of claims based upon charitable pledges. As the bankruptcy court in the Southern District of New York stated, philanthropic actions "cannot be undertaken at the expense of a debtor's creditors." *In re 375 Park Ave. Associates, Inc.*, 182 B.R. 690, 697 (Bankr. S.D.N.Y. 1995). The bankruptcy courts consistently have allowed trustees to recover charitable payments made prior to bankruptcy, and to deny proposed charitable contributions to be made under reorganization plans under the Bankruptcy Code because they lack consideration and there was no reasonably equivalent value in exchange for the charitable donation. *See e.g. In re Young*, 82 F.3d 1407, 1416 (8th Cir. 1996); *Weinman v. Word of Life Christian Ctr. (In re Bloch)*, 207 B.R. 944, 948 (D. Colo. 1997).

In fact, bankruptcy courts have historically treated charitable claims so unfavorably that Congress passed the Religious Liberty and Charitable Donation Protection Act of 1998, amending several provisions of the Bankruptcy Code, including §§ 544(b), 548(a)(2), 707(b), and § 1325(b)(2)(A) to protect certain donations to qualified religious or charitable organizations in response to the bankruptcy courts'

treatment of charitable donations.[1] *See Religious Liberty and Charitable Donation Protection Act of 1998*, Pub. L. No. 105-183, 112 Stat. 518 (1998); see also, 143 CONG. REC. E2037 (daily ed. Oct. 21, 1997),  144 CONG. REC. S4769-4772 (daily ed. May 13, 1998) and  144 CONG. REC. H.23-29 (daily ed. June 13, 1998) (attached hereto as Appendix 8).  The Act only applies to charitable donations or pledges made by debtors who are natural persons in Chapter 7 and 13 cases. See 11 U.S.C. § 548(d)(3). Therefore the Act provides no protection to SCC Kyle, a limited partnership, or Seton in this Chapter 11 case. The Charitable Pledge is not enforceable under Texas law and the bankruptcy court erred in overruling Whitney Bank's Objection to the Claim of Seton Family of Hospitals. For reasons stated, the bankruptcy court's order allowing the claim filed by Seton based upon the unfulfilled charitable pledge to the Foundation should be reversed.

## PRAYER

WHEREFORE, Whitney Bank respectfully requests that this Court reverse the Order Denying Whitney Bank's Objection to Claim of Seton Family of Hospitals and disallow the claim filed by Seton Family of Hospitals in the bankruptcy case, and that Whitney Bank have and recover any and all other general relief to which they may be entitled.

---

[1]     Congress initially passed the Religious Freedom Restoration Act of 1993, 42 U.S.C. §2002bb, *et. seq.,* to address the unfavorable treatment of charitable donations in bankruptcy cases, but that statute was struck down by the United States Supreme Court as unconstitutional in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

DATED:  April 15, 2014

Respectfully submitted,

**WINSTEAD PC**
401 Congress Ave., Suite 2100
Austin, Texas 78701
(512) 370-2800 – telephone
(512) 370-2850 – facsimile

By:___/s/ James G. Ruiz_____
        James G. Ruiz
        State Bar No. 17385860

**ATTORNEYS FOR APPELLANT
WHITNEY BANK**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 15, 2014, a true and correct copy of

this document was served electronically on all registered ECF users in this case, and by

Certified Mail, Return Receipt Requested on all persons identified below.

Eric J. Taube
Mark Taylor
Hohmann Taube & Summers, LLP
100 Congress Ave., Suite 1800
Austin, TX 78701

Ida A. Murguia
Seton Family of Hospitals
1345 Philomena Street, Suite 410.2
Austin, Texas 78723

        _____/s/ James G. Ruiz_____
              James G. Ruiz

# IN THE
# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

### Civil Action No. 1:13-cv-00756-LY

---

IN RE:
SCC KYLE PARTNERS, LTD.

WHITNEY BANK

Appellant,

v.

SCC KYLE PARTNERS, LTD.,
AND SETON FAMILY HOSPITALS
D//B/A SETON MEDICAL CENTER HAYS

Appellees.

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

## APPENDIX TO REPLY BRIEF OF APPELLANT

**Appendix Tab 8.-** Congressional Records Relating to Religious Liberty and Charitable Donation Protection Act of 1998-

- 143 CONG. REC. E2037 (Oct. 21, 1997)

- 144 CONG. REC. S4769 (May 13, 1998)

- 144 CONG. REC. H23 (June 3, 1998)

9

**Appendix Tab 8**

In the ensuing four decades, under the leadership of Dr. Meister, Dr. James A. Colston, Dr. Roscoe C. Brown, Jr., and Dr. Leo A. Corbie, Bronx Community College has grown to be a modern community college offering 2–year associate degree programs in a variety of disciplines. The college's community service programs currently serve more than 25,000 residents of the city through academic upgrading, job training and placement, cultural enrichment, and recreation.

Throughout its existence, Bronx Community College has adhered to the highest standards. In its early days, the reputation it built through the success of its graduates helped BCC to achieve steady growth in difficult economic times. Most BCC graduates find employment in positions related to their fields of study thanks to a partnership with local businesses and industries.

Mr. Speaker, on that same day, BCC will welcome its new leader, Dr. Carolyn Grubbs Williams, an outstanding individual who has dedicated her life to education and public service. She will be installed as the fourth president of the Bronx Community College. The first female to head Bronx Community College, Dr. Williams was named president in June of 1996.

Dr. Williams earned a bachelor's degree in sociology, a master's degree in urban planning and a Ph.D. in higher education, all from Wayne State University in Detroit. She has shown the importance of higher education, with a focus on community college throughout her long and distinguished career. She is an expert in designing programs to help community college students continue their education beyond the traditional 2 years.

Through her years of service, she has worked for several higher education institutions. Before coming to New York, she has served as vice provost of Wayne County College and acting vice president for Academic Affairs at Highland Park Community College, both in Detroit. She also has served as consultant for the Ford Foundation Urban Transfer Opportunity Program and the United Negro College Fund's Transfer Opportunity Program.

The business, professional and civic organizations to which she belongs, like the honors and awards she has been given demonstrate that. Dr. Williams joins BCC with many lessons learned in leadership in education, community service, and wisdom. It is our hope that the addition of Dr. Williams to the Bronx Community College will bring continued success to the institution.

Mr. Speaker, I have the privilege of representing the 16th district of New York where Bronx Community College is located and I am delighted by its success. In addition, I participate every year in the 10K race organized by BCC.

I ask my colleagues to join me in paying tribute to Bronx Community College, to the administration and faculty, and to the students, whose ambition and hard work have made this great institution a tremendous source of pride and success for the last 40 years.

---

## WE MUST PROTECT OUR CHURCHES AND CHARITIES

---

## HON. RON PACKARD
OF CALIFORNIA
IN THE HOUSE OF REPRESENTATIVES

*Tuesday, October 21, 1997*

Mr. PACKARD. Mr. Speaker, how much of the work done by your church or favorite charity depends on the generous donations of parishioners and contributors like yourself? Did you know that creditors can take already donated money from them because current bankruptcy law allows them to do so? It's unbelievable, but it's true.

In a recent case, a U.S. Federal Bankruptcy Trustee brought an action against the Crystal Evangelical Free Church of New Hope, MN. In doing so, the unprecedented case reinterpreted the Bankruptcy Code to mean that if an individual gives money to a nonprofit group within 1 year of declaring bankruptcy, creditors can come after the group to reclaim this money. Why? Because an individual must receive something of reasonable equivalent value in return for a monetary donation.

Mr. Speaker, current law essentially says that if an individual has filed for bankruptcy, he cannot simply donate money to a charitable organization or to the church. However, because the Bankruptcy Code allows for certain "entertainment exemptions," taking a luxury vacation, purchasing liquor, buying a new car, or making 1–900 calls to psychics, are all reasonable expenditures.

This case outraged me and I decided to do something about it. I introduced legislation in early October to protect certain charitable contributions. Known as the Religious Liberty and Charitable Donation Protection Act, this legislation will amend U.S. Code to protect our Nation's churches and charities from the hands of creditors.

Mr. Speaker, H.R. 2604, the Religious Liberty and Charitable Donation Protection Act will allow your church or favorite charity to continue to thrive and prosper. Donations received in good faith from individuals will not be taken from their pockets by creditors. I encourage all of my colleagues to cosponsor this important legislation. As the holidays quickly approach, we must work to address the needs of our churches, charities, and the less fortunate who rely on their vital services. H.R. 2604 will do just that.

---

CONFERENCE REPORT ON H.R. 2158, DEPARTMENTS OF VETERANS AFFAIRS AND HOUSING AND URBAN DEVELOPMENT, AND INDEPENDENT AGENCIES APPROPRIATIONS ACT, 1998

SPEECH OF

## HON. MARK W. NEUMANN
OF WISCONSIN
IN THE HOUSE OF REPRESENTATIVES

*Wednesday, October 8, 1997*

Mr. NEUMANN. Mr. Speaker, as a former homebuilder, I have always thought that the steps people must take to purchase homes and get mortgages is confusing and difficult. I rise today to express my concern with a new HUD proposal which threatens to make buying a home even more difficult and more expensive for millions of Americans: HUD's proposed change to Regulation X which implements the Real Estate Settlement Procedures Act [RESPA].

RESPA was passed in 1974 to address two concerns. First, it requires lenders to inform borrowers of the costs they will face once they close on a home loan. Second, it prohibits lenders from making referral payments to individuals or businesses who recommend their services.

Congress did not anticipate recent innovations in the mortgage banking industry when it passed RESPA. Mortgage brokers now play key roles in serving home buyers, particularly those with lower incomes. RESPA's outdated approach has resulted in over 50 class action lawsuits claiming that lender-paid mortgage broker fees are prohibited because they are referral fees, despite the fact that these fees have helped cut the closing costs for home buyers.

Congress has before it a bill I have cosponsored, H.R. 1283, which would call a time out on these lawsuits until RESPA can be reformed to reflect current market operations. On March 3 of this year, over 30 bipartisan Members of Congress—including several from the HUD Appropriations Subcommittee—signed a letter written by Housing Subcommittee Chairman Lazio asking HUD to clarify RESPA's definition of lender-paid broker fees to make sure it protects consumers without restricting access to affordable mortgage credit. However, this new rule could reduce mortgage brokers ability to help people by setting fixed fees in addition to requiring fee disclosure.

As a member of the Subcommittee on VA/HUD and Independent Agencies of the House Appropriations Committee, I believe HUD should delay this new rule as long as Congress is working faithfully to update RESPA. Secretary Cuomo has already committed to delaying the implementation of similar RESPA rule regarding employee compensation while Congress works to reform RESPA. I am hopeful similar consideration will be given to proposed changes to Regulation X. I am confident that in the end, Congress will approve a new law that makes it easier for both consumers and lenders.

---

## TRIBUTE TO THE CONSTRUCTION INDUSTRY

---

## HON. PETE SESSIONS
OF TEXAS
IN THE HOUSE OF REPRESENTATIVES

*Tuesday, October 21, 1997*

Mr. SESSIONS. Mr. Speaker, I'd like to take the opportunity to commend a segment of our working population that seldom gets the recognition it deserves. The construction industry, one of the largest industries in the Nation, provides well paying jobs with valuable career opportunities for close to 5 million American workers every year. To remain at the present level of activity, the construction industry needs an additional quarter of a million workers per year to replace an aging and retiring workforce. As it continues to bring productive and talented craftsmen and women into its ranks, the construction trade deserves our thanks.

In order to keep pace with the growing construction needs of the American public, there

| Reed | Rockefeller | Wellstone |
| Reid | Sarbanes | Wyden |
| Robb | Torricelli | |

The PRESIDING OFFICER. On this vote, the yeas are 59, the nays are 41. Three-fifths of the Senators duly chosen and sworn not having voted in the affirmative, the motion is rejected.

Mr. LEVIN. Mr. President, I move to reconsider the vote by which the motion was rejected.

Mr. FORD. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. HATCH addressed the Chair.

The PRESIDING OFFICER. The Senator from Utah is recognized.

Mr. HATCH. Mr. President, let me yield to my colleague from Iowa.

The PRESIDING OFFICER. The Senator from Iowa is recognized.

Mr. GRASSLEY. Mr. President, I ask that the Senate now proceed to the consideration of S. 1244 under the consent order.

---

## RELIGIOUS LIBERTY AND CHARITABLE DONATION PROTECTION ACT OF 1998

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

A bill (S. 1244) to amend title 11, United States Code, to protect certain charitable contributions, and for other purposes.

The Senate proceeded to consider the bill which had been reported from the Committee on the Judiciary, with an amendment to strike all after the enacting clause and inserting in lieu thereof the following:

*SECTION 1. SHORT TITLE.*

*This Act may be cited as the "Religious Liberty and Charitable Donation Protection Act of 1998".*

*SEC. 2. DEFINITIONS.*

*Section 548(d) of title 11, United States Code, is amended by adding at the end the following:*

*"(3) In this section, the term 'charitable contribution' means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—*

*"(A) is made by a natural person; and*

*"(B) consists of—*

*"(i) a financial instrument (as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986); or*

*"(ii) cash.*

*"(4) In this section, the term 'qualified religious or charitable entity or organization' means—*

*"(A) an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or*

*"(B) an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.".*

*SEC. 3. TREATMENT OF PRE-PETITION QUALIFIED CHARITABLE CONTRIBUTIONS.*

*(a) IN GENERAL.—Section 548(a) of title 11, United States Code, is amended—*

*(1) by inserting "(1)" after "(a)";*

*(2) by striking "(1) made" and inserting "(A) made";*

*(3) by striking "(2)(A)" and inserting "(B)(i);*

*(4) by striking "(B)(i)" and inserting "(ii)(I)";*

*(5) by striking "(ii) was" and inserting "(II) was";*

*(6) by striking "(iii)" and inserting "(III)"; and*

*(7) by adding at the end the following:*

*"(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—*

*"(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or*

*"(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.".*

*(b) TRUSTEE AS LIEN CREDITOR AND AS SUCCESSOR TO CERTAIN CREDITORS AND PURCHASERS.—Section 544(b) of title 11, United States Code, is amended—*

*(1) by striking "(b) The trustee" and inserting "(b)(1) Except as provided in paragraph (2), the trustee"; and*

*(2) by adding at the end the following:*

*"(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.".*

*(c) CONFORMING AMENDMENTS.—Section 546 of title 11, United States Code, is amended—*

*(1) in subsection (e)—*

*(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and*

*(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)";*

*(2) in subsection (f)—*

*(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and*

*(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)"; and*

*(3) in subsection (g)—*

*(A) by striking "section 548(a)(1)" each place it appears and inserting "section 548(a)(1)(A)"; and*

*(B) by striking "548(a)(2)" and inserting "548(a)(1)(B)".*

*SEC. 4. TREATMENT OF POST-PETITION CHARITABLE CONTRIBUTIONS.*

*(a) CONFIRMATION OF PLAN.—Section 1325(b)(2)(A) of title 11, United States Code, is amended by inserting before the semicolon the following: ", including charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made".*

*(b) DISMISSAL.—Section 707(b) of title 11, United States Code, is amended by adding at the end the following: "In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).".*

*SEC. 5. APPLICABILITY.*

*This Act and the amendments made by this Act shall apply to any case brought under an applicable provision of title 11, United States Code, that is pending or commenced on or after the date of enactment of this Act.*

*SEC. 6. RULE OF CONSTRUCTION.*

*Nothing in the amendments made by this Act is intended to limit the applicability of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2002bb et seq.).*

The PRESIDING OFFICER. Under the previous order, there are 10 minutes equally divided on each side.

Mr. GRASSLEY. Mr. President, I yield myself such time as I might consume.

The PRESIDING OFFICER. The Senator from Iowa is recognized.

Mr. GRASSLEY. Mr. President, I rise in strong support of S. 1244, The Religious Liberty and Charitable Donation Protection Act, which I introduced in October of last year.

When I held hearings on this bill before my subcommittee, I learned that churches and charities around the country are experiencing a spate of lawsuits by bankruptcy trustees trying to undo tithes or charitable donations. Under provisions of the Bankruptcy Code originally designed to fight fraudulent transfers of assets or money on the eve of bankruptcy, bankruptcy trustees have begun to sue churches when one of their parishioners declares bankruptcy, charging that tithes are fraud.

Of course, this puts the fiscal health of many churches at serious risk. Most churches and charities don't have big bank accounts. Having to pay back money that has been received and already spent is a real hardship for churches which often live on a shoestring budget. S. 1244 will protect against that.

Protecting churches and charities from baseless bankruptcy lawsuits will protect key players in the delivery of services to the poor. What do churches do with tithes? What do charities do with contributions?

They feed the poor with soup kitchens. They collect used clothing and help provide shelter for the homeless. And they do it with a minimal amount of Government assistance. In this day and age, where Congress is seeking to trim the Federal Government to its appropriately limited role, we must prospect the important work of churches and charities. Mr. President, S. 1244 is a giant step in that direction.

This bill doesn't amend Section 548(A)(l) of the Bankruptcy Code. This means that any transfer of assets on the eve of bankruptcy which is intended to hinder, delay or defraud anyone is still prohibited. Only genuine charitable contributions and tithes are protected by S. 1244. Because if assets which looks like a tithe or a charitable donation, but which is actually fraud, can still be set aside. For example, if someone who is about to declare bankruptcy gives away all of his assets in donations of less than 15 percent of his income, that would be strong evidence of real fraud and real fraud can't be tolerated.

Mr. President, my legislation also permits debtors in chapter 13 repayment plans to tithe during the course of their repayment plan. Under current law, people who declare bankruptcy under chapter 13 must show that they are using all of their disposable income to repay their creditors. The term disposable income has been interpreted by the courts to allow debtors to have a reasonable entertainment budget during their repayment period. But these

same courts won't let people tithe. So, a debtor could budget money for movies or meals at restaurants, but they couldn't use that same money to tithe to their church. This is a direct and outrageous assault on religious freedom. And I think it's quite clearly contrary to Congress' intent in enacting chapter 13. I doubt anyone would have supported the idea that debtors could pay money to a gambling casino for entertainment but could not give the same money to a church as a tithe.

Mr. President, S. 1244 is necessary at this time because the Supreme Court struck down the Religious Freedom Restoration Act as unconstitutional last summer. A badly-divided panel of the Eighth Circuit Court of Appeals has recently ruled that RFRA protects tithes, even after the Supreme Court case. But that decision is being appealed to the Supreme Court. No matter what the Court does, we need to pass this bill now, and to subject churches to uncertainty and harassment by bankruptcy trustees.

Mr. President, I think it's important to remember that my bill protects donations to churches as well as other types of nonprofit charities. I did this because many well-respected constitutional scholars believe that protecting only religiously-motivated donations from the reach of the Bankruptcy Code would violate the establishment clause of the first amendment.

Now a concern was recently raised that S. 1244 doesn't protect unincorporated churches. That just isn't so. Professor Douglas Laycock, perhaps the leading scholar on religious freedom, has written to me on this topic and has concluded that unincorporated churches would in fact be protected. I ask unanimous consent that his letter be printed in the RECORD following my remarks.

The PRESIDING OFFICER. Without objection, it is so ordered. (See exhibit 1.)

Mr. GRASSLEY. Mr. President, I would like to close on this note. When I chaired a hearing on tithing and bankruptcy before my subcommittee late last year, I heard from the pastor of Crystal Free Evangelical Church. This church is the one fighting right now in the Eighth Circuit Court of Appeals to keep the bankruptcy court out of its church coffers. Pastor Goold testified in a very compelling way about the practical difficulties his church has faced because of the Bankruptcy Code. As Pastor Goold put it, when there's a conflict between the bankruptcy laws and the laws of God, we should change the bankruptcy laws because God's laws aren't going to change.

Whether someone believes in tithing or not, it's clear that many Americans feel that tithing is an act of worship, required by divine law. It's completely unacceptable to have the bankruptcy code undo an act of worship.

EXHIBIT 1

UNIVERSITY OF TEXAS AT AUSTIN,
SCHOOL OF LAW,
*Austin, TX, May 6, 1998.*
Hon. CHARLES E. GRASSLEY,
*Hart Senate Office Building,*
*Washington, DC.*

DEAR SENATOR GRASSLEY: The question has arisen whether S. 1244 and H.R. 2604 would protect unincorporated churches. The answer is yes; unincorporated churches would be protected.

These bills protect organizations defined in §170(c)(2) of the Internal Revenue Code, which includes any "corporation, trust, or community chest, fund, or foundation" organized and operated exclusively for charitable, religious, or other listed purposes. The Internal Revenue Code defines "corporation" to include an "association." 26 U.S.C. §7701(a)(3). An unincorporated association may also be a "fund."

The language of §170(c)(2) dates to shortly after World War I. Related sections drafted more recently use the word "organization," which more obviously includes unincorporated associations. See, e.g., §170b and §§502–511. The implementing regulations under §170 and §501(c)(3) also used the word "organization." 26 C.F.R. §§1.170 and 1.501. "Organization" does not appear to be a defined term. But Treasury Regulations define "articles of organization" in inclusive terms: "The term articles of organization or articles includes the trust instrument, the corporate charter, *the articles of association,* or any other written instrument by which an organization is created." 26 C.F.R. §1.501(c)(3)(b)(2) (emphasis added) "Articles of association" clearly seems designed to include unincorporated associations.

The clearest statement from the Internal Revenue Service appears to be Revenue Procedure 82–2 (attached), which sets out certain rules for different categories of tax exempt organizations. Section 3.04 provides a rule for "Unincorporated Nonprofit Associations." This Procedure treats the question as utterly settled and noncontroversial.

Tax scholars agree that §170 includes unincorporated associations. The conclusion appears to be so universally accepted that there has been no litigation and no need to elaborate the explanation. The leading treatise on tax-exempt organizations states: "An unincorporated association or trust can qualify under this provision, presumably as a fund or foundation or perhaps, as noted, as a corporation." Bruce R. Hopkins, The Law of Tax-Exempt Organizations §4.1 at 52 (7th ed. 1997).

Boris Bittker of Yale and Lawrence Lokken of NYU says: "Since the term corporation includes associations and fund or foundation as used in IRC §501(c)(3) is construed to include trusts, the technical form in which a charitable organization is clothed rarely results in disqualification." Boris I. Bittker & Lawrence Lokken, 4 Federal Taxation of Income, Estates and Gifts ¶100.1.2 at 100-6 (2d ed. 1989).

Closely related provisions of the Code expressly cover churches. I.R.C. §170(b)(1) states special rules for a subset of organizations defined in §170(c), including "a church, or a convention or association of churches." I.R.C. §508(c)(1) provides that "churches, their integrated auxiliaries, and conventions or associations of churches" do not have to apply for tax exemption. These provisions plainly contemplate that churches are covered; they also prevent the accumulation of IRS decisions granting tax exempt status to unincorporated churches. These churches are simply presumed to be exempt.

There are tens of thousands of unincorporated churches in America. I am not aware

that any of these churches has ever had difficulty with tax exemption or tax deductibility of contributions because of their unincorporated status. I work with many church lawyers and religious leaders, and none of them has ever mentioned such a problem. There are no reported cases indicating litigation over such a problem. If unincorporated churches were having this problem, Congress would have heard demands for constituent help or corrective legislation.

The fact is that legitimate unincorporated churches that otherwise qualify for tax deductibility under §170 and for tax exemption under §501(c)(3) are not rendered ineligible by their failure to incorporate. There is so little doubt about that that neither Congress, the IRS, nor the courts have ever had to expressly elaborate on the rule that everyone knows. This is a question that can be safely dealt with in legislative history affirming Congress's understanding that unincorporated associations are included in §170(c)(2) and Congress's intention that they be protected by these bills.

I consulted informally with Deirdre Halloran, the expert on tax exempt organizations at the United States Catholic Conference, and with tax professors here and elsewhere, who confirmed these conclusions. Ms. Halloran would be happy to respond to inquiries from your office if you need a second opinion.

Very truly yours,

DOUGLAS LAYCOCK.

Mr. GRASSLEY. I yield the floor.

Mr. HATCH. I compliment the distinguished Senator from Iowa and the distinguished Senator from Illinois for their work on this bill.

This is called the Religious Liberty and Charitable Donations Act of 1998, and I urge all of my colleagues to vote for its passage.

S. 1244 will help spell out the safe harbors for tithe-payers or others who contribute to charitable organizations and then find themselves in bankruptcy. It will work, together with the Religious Freedom Restoration Act in this area, to relieve burdens on often strained organizations that provide important services to our society. It will relieve an untenable burden on the religious rights of tithe-payers throughout America.

Mr. President, the issue of the status of tithes paid to churches by religiously motivated Americans who find themselves in bankruptcy proceedings has vexed tithe-payers and our courts for a number of years now. Vigilant, and some might say over-zealous, bankruptcy trustees have tried to recover tithes paid to churches as fraudulent conveyances under the bankruptcy code. Hundreds, if not thousands, of such claims for recovery against churches have been filed over the last few years. This has imperiled many churches, which operate on the offerings they receive as they come in. By the time a bankruptcy claim is filed, the money has been spent feeding the poor or otherwise serving the needs of the congregation. Many churches find it very difficult to make up money that has already been spent, and when they can, it weakens their ability to do the charitable and spiritual work that is part of the grand tradition of religious charity in America.

Not only are the churches themselves imperiled, but many believers are told by the government that they can no longer pay tithes once they have been in bankruptcy, even if a believing debtor wishes to forgo allowable entertainment expenses to pay the tithing they believe God requires of them. This is an unsupportable interposition of Uncle Sam and the bankruptcy system between believing Americans and God.

I believe we fixed the problem in 1993, when we passed the Religious Freedom Restoration Act ("RFRA"), which gave greater protections to religious activities across the board than the courts were affording at that time. An early bankruptcy case under that law, however, and the position the Clinton Justice Department took in that case, risked undermining those protections. Under pressure from me and others in Congress, the Justice Department reversed itself on direct orders from the President. And, luckily, the 8th Circuit Court of Appeals applied RFRA's stronger protections to the case. When that decision was appealed to the Supreme Court, however, it was vacated and remanded by the Supreme Court for further proceedings in light of the Court's decision in *City of Boerne* v. *Flores,*—U.S.—,117 S. Ct. 2157 (1997), in which it held that RFRA was unconstitutional as applied to the states. Upon the review of the Young case, I filed an amicus brief in the 8th Circuit, arguing with others that Boerne had no effect on questions of federal law such as bankruptcy, and so RFRA was constitutional and should apply in the bankruptcy context. I am pleased to report that the case of *Christians* v. *Crystal Evangelical Free Church,* 1998 WL 166642 (8th Cir. (Minn.)), decided last month, held RFRA to be constitutional for federal law purposes and protective of tithes in bankruptcy proceedings.

The uncertainty caused by Boerne accelerated the challenging of tithes as fraudulent conveyances, and in turn spurred our efforts to clarify the law. I am glad that RFRA will continue to be of service in this area, but I am also pleased that we will have targeted legislation to clear up any remaining confusion without undue confusion during further litigation. S. 1244 will help spell out the safe harbors or tithe payers or others who contribute to charitable organizations and then find themselves in bankruptcy. It will relieve burdens on often-strained organizations that provide important services in our society, and relieve an untenable burden on the religious rights of tithe payers across America.

Let me thank all of those who worked on this legislation, especially Senator GRASSLEY and Senator DURBIN, who are leaders on bankruptcy issues on the Judiciary Committee, and, in the case of at least Senator GRASSLEY and I believe Senator DURBIN, are strong supporters of the religious rights of our people. I thank both of them for the work in this area. We have worked to make this legislation useful and efficacious. So I urge all of our colleagues to vote for its passage.

Mr. SESSIONS addressed the Chair.

The PRESIDING OFFICER. Who yields time?

The Senator from Alabama.

Mr. GRASSLEY. I yield to the Senator from Alabama.

The PRESIDING OFFICER. The Senator from Alabama is recognized.

Mr. SESSIONS. Mr. President, I rise to speak on behalf of the Religious Liberty and Charitable Donation Protection Act of 1998. It is an honor to work with my good friend from Iowa on this important piece of legislation, and I thank him for his leadership on this issue.

In an important 1970 Supreme Court case upholding tax exemptions for churches, Chief Justice Burger spoke of the Government's relationship with religion as being a relationship of "benevolent neutrality". It seems more and more that the Government's "benevolent neutrality" is becoming harder to discern, often being replaced with what appears to be "outright hostility".

A good example of this is found in Federal bankruptcy law. In the 1995 case of "In re Tessier," a couple filed for bankruptcy under Chapter 13. Out of their net monthly income of $1,610, they proposed to continue making contributions to their church in the amount of $100 per month. This couple had deeply-held religious convictions about donating to the church as part of the exercise of their religious faith. They proposed spending only $200 per month on food, and nothing on entertainment, recreation, health insurance, life insurance, cable television, telephone, or even electrical utility service. Nevertheless, the Bankruptcy Court ruled that during the 5 year duration of their Chapter 13 plan, this couple could not make the proposed contributions to their church. This was in spite of the fact that the Court would probably have allowed them to spend that sum of money on entertainment or recreational expenses.

The matter of pre-bankruptcy contributions to a church or charity is also a matter of much concern. Several courts have actually interpreted the bankruptcy law to require churches to refund donations made to them in the year prior to a debtor filing bankruptcy. In making such rulings, the courts hold that donations to the church are "fraudulent conveyances"— that is, by giving the money to the church without (according to the courts) receiving something economically valuable in return, they are defrauding their creditors. In reality, there is no fraud involved. And of course you can imagine the potential burden on small churches that may be just getting by financially—churches that have done nothing wrong—to find that they are required to repay a year's worth of contributions received from a faithful contributor.

The Grassley-Sessions bill is a commonsense bill that would clarify the bankruptcy law to ensure that our courts will no longer make the sort of rulings that I have described.

Under our bill, contributions of up to 15% of a person's income, or a higher amount that is consistent with an individual's past practice of giving, will not be considered fraudulent when made during the year prior to filing bankruptcy. Consequently, innocent churches and charities would not have to repay such contributions.

Secondly, our bill will allow debtors under Chapter 13 repayment plans to make charitable contributions of up to 15% of their income. If bankruptcy law allows for spending on recreational expenses while under a Chapter 13 repayment plan, it should also allow an individual to tithe to their church or make reasonable charitable contributions.

Mr. President, this is an important bill which will help to restore the Government to its rightful position of benevolent neutrality toward religion. It will provide necessary legislative guidance in an area of bankruptcy law that has gotten off track. I urge my colleagues to join with me in support of this legislation.

Mr. President, I am honored to support this legislation. Senator GRASSLEY has done an excellent job in identifying an unfair component of the Bankruptcy Act. If an individual pays money to a nightclub, a casino, or to any other recreational activity whatsoever, that person who received the money does not have to give it back to the bankruptcy court. If they had given money to a charitable enterprise or a church, they could be required to give it back. And in chapter 13 where an individual pays out their debts on a regular basis, the courts have denied them the right to give money to charitable institutions as part of their regular payments while at the same time allowing them substantial amounts of money for recreational expenditures. We think that is unfair. We think this bill is a sound way to correct that problem.

I am honored to work with Senator GRASSLEY and support him in this effort.

Mr. DURBIN. Mr. President, it is a pleasure to stand in support of this legislation. Senator GRASSLEY and I have worked on it, but I want to give him the lion's share of the credit because this was his notion, his concept, and he has developed it into a very good piece of legislation.

We work closely together on these bankruptcy issues, and for those who are interested in bankruptcy stay tuned; there is more to follow. But I think you will find this bill noncontroversial and certainly everyone should be able to support.

The bottom line here is whether or not you are dealing with a fraudulent conveyance. Someone in anticipation of bankruptcy may give away money and it is said by the court that you cannot do that; if you are going to give money away for nothing, then we are

going to come back later on in the bankruptcy court and recover it. But Senator GRASSLEY has pointed out, I think appropriately, the situation where people give money to a charity or a church, and he says that should be considered in a different category. And I agree. As he has mentioned in the opening statement, there is a limitation in the law of 15 percent of your annual income that can be given in this fashion. So we don't anticipate any type of abuse in this area.

I thank Senator GRASSLEY. It is a pleasure to work with him and work with him. We have more to follow on the bankruptcy issue, but I am anxious to encourage my Democratic colleagues today to join with us in voting for this legislation.

Mr. SARBANES. Will the Senator yield?

Mr. DURBIN. I will be happy to yield to the Senator from Maryland.

Mr. SARBANES. I am prompted by something the ranking member of the subcommittee said which leads me to put an inquiry to him and to Senator GRASSLEY.

There are a number of bankruptcy districts in the country that are facing very serious problems in handling their caseload. I have been in frequent communication with the subcommittee about this, and obviously my district is one of them. It has consistently now, for 4 or 5 years, ranked at the very top of case overload of all bankruptcy districts in the United States. Every study that has been made has recommended additional bankruptcy judges, and I note for a fact that the existing bankruptcy judges in my district are severely overworked. This is denying economic justice to both creditors and debtors. It is a matter which needs to be addressed. It is a pressing crisis.

Now, the House sent over to us some time ago legislation providing for some additional judges based on comprehensive studies undertaken by the Administrative Office of the Courts and by others. This session is moving along. If we don't get some relief, we are going to continue to have this extraordinary situation which exists in quite a number of districts across the country in terms of reducing their backlog. It is a very severe problem in a number of districts.

I am prompted by Senator DURBIN's reference, and Senator GRASSLEY's assent to it, as I understood it, there is more to follow. So I just put the inquiry whether this is one of the matters to follow. I would certainly hope so.

Mr. DURBIN. Mr. President, if I might say in response to my friend, the Senator from Maryland, I agree with him completely. We now know that the caseload in bankruptcy courts has been growing every single year. It really taxes the system, and if not in this legislation, in the following bill I hope we will provide the resources to make sure the bankruptcy courts can respond.

Mr. GRAMS. Mr. President, I rise in strong support of Senator GRASSLEY's bill, S. 1244, which exempts individual tithes to churches from bankruptcy proceedings. The exemption is up to 15 percent of income to prevent abuse.

This problem was brought to my attention by the Crystal Evangelical Free Church in Minnesota, which prompted my cosponsor of this important legislation. The Church was sued and required to repay tithes given to it by individuals who had declared bankruptcy. Churches depend on tithes for their income to operate effectively. They should not be liable for debt repayment of their parishioners.

This legislation is needed to protect churches from this kind of abuse. It is the right thing to do. I commend the Senator from Iowa for his effective leadership on this issue.

Mr. HATCH. Mr. President, I ask for the yeas and nays on the bill.

The PRESIDING OFFICER. The yeas and nays have been requested. Is there a sufficient second? There seems to be a sufficient second.

The yeas and nays were ordered.

The PRESIDING OFFICER. Under the previous order, the committee amendment is agreed to and the bill is read the third time. The question is, Shall the bill pass? The yeas and nays have been ordered. The clerk will call the roll.

The legislative clerk called the roll.

The result was announced—yeas 99, nays 1, as follows:

[Rollcall Vote No. 132 Leg.]

YEAS—99

| | | |
|---|---|---|
| Abraham | Faircloth | Lott |
| Akaka | Feingold | Lugar |
| Allard | Feinstein | Mack |
| Ashcroft | Ford | McCain |
| Baucus | Frist | McConnell |
| Bennett | Glenn | Mikulski |
| Biden | Gorton | Moseley-Braun |
| Bingaman | Graham | Moynihan |
| Bond | Gramm | Murkowski |
| Boxer | Grams | Murray |
| Breaux | Grassley | Nickles |
| Brownback | Gregg | Reed |
| Bryan | Hagel | Reid |
| Bumpers | Harkin | Robb |
| Burns | Hatch | Roberts |
| Byrd | Helms | Rockefeller |
| Campbell | Hollings | Roth |
| Chafee | Hutchinson | Santorum |
| Cleland | Hutchison | Sarbanes |
| Coats | Inhofe | Sessions |
| Cochran | Inouye | Shelby |
| Collins | Jeffords | Smith (NH) |
| Conrad | Johnson | Smith (OR) |
| Coverdell | Kempthorne | Snowe |
| Craig | Kennedy | Specter |
| D'Amato | Kerrey | Stevens |
| Daschle | Kerry | Thomas |
| DeWine | Kyl | Thompson |
| Dodd | Landrieu | Thurmond |
| Domenici | Lautenberg | Torricelli |
| Dorgan | Leahy | Warner |
| Durbin | Levin | Wellstone |
| Enzi | Lieberman | Wyden |

NAYS—1

Kohl

The bill (S. 1244), as amended, was passed.

Mr. SESSIONS. Mr. President, I move to reconsider the vote by which the bill passed.

Mr. DOMENICI. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. DOMENICI addressed the Chair.

The PRESIDING OFFICER. The Senator from New Mexico.

## MORNING BUSINESS

Mr. DOMENICI. Mr. President, I ask unanimous consent that there now be a period for the transaction of morning business until the hour of 2 p.m. today, with Senators permitted to speak for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

## UNANIMOUS CONSENT AGREEMENT—S. 1260

Mr. DOMENICI. Mr. President, I ask unanimous consent that at 2 o'clock, the Senate begin consideration of S. 1260 under the consent agreement.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DOMENICI addressed the Chair.

The PRESIDING OFFICER. The Senator from New Mexico.

(The remarks of Mr. DOMENICI pertaining to the introduction of S. 2072 are located in today's RECORD under "Statements on Introduced Bills and Joint Resolutions.")

Mr. DOMENICI. I yield the floor.

Mr. REID addressed the Chair.

The PRESIDING OFFICER. The Senator from Nevada.

## EQUITY IN PRESCRIPTION AND CONTRACEPTION COVERAGE ACT

Mr. REID. Mr. President, yesterday's USA Today headline: "Viagra heightens insurance hopes for comfort care." The first paragraph says:

While health insurers try to decide whether to pay for the impotence drug Viagra, a poll shows half of Americans think men should pay for it themselves.

Mr. President, I will bet those half are women. Women have really been treated unfairly in this. Senator OLYMPIA SNOWE and I introduced legislation last May, the Equity in Prescription and Contraception Coverage Act, which in effect said that health care providers that provide prescription drugs should also provide contraceptives.

We have waited a year. We have not been able to even get a hearing on this. The reason I am here today is to speak for American women who have been treated so unfairly by male-dominated legislatures for the last many decades.

Women pay about 70 percent more for their health care than do men, mostly related to reproductive problems. We have a situation where we have 3.6 million unintended pregnancies in this country every year. And 45 percent of them wind up in abortions. We find these insurance companies, these health care providers, will pay for a tubal ligation, they will pay for abortions, they will pay for a vasectomy, but they will not provide money for the pill.

An average pregnancy, unintended pregnancy, in this country costs an average of about $1,700. I say, why can't

bring these very worthy initiatives to the floor. I appreciate their support and their effort.

Mr. Speaker, I urge our colleagues to support this legislation, and I yield back the balance of my time.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from New York (Mr. McHUGH) that the House suspend the rules and pass the bill, H.R. 2799.

The question was taken; and (two-thirds having voted in favor thereof), the rules were suspended and the bill was passed.

A motion to reconsider was laid on the table.

───────────

GENERAL LEAVE

Mr. McHUGH. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to revise and extend their remarks on the bill, H.R. 2799.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from New York?

There was no objection.

───────────

□ 1530

RELIGIOUS LIBERTY AND CHARITABLE DONATION PROTECTION ACT OF 1998

Mr. GEKAS. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 2604) to amend title 11, United States Code, to protect certain charitable contributions, and for other purposes, as amended.

The Clerk read as follows:

H.R. 2604

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*SECTION 1. SHORT TITLE.*

*This Act may be cited as the "Religious Liberty and Charitable Donation Protection Act of 1998".*

*SEC. 2. DEFINITIONS.*

*Section 548(d) of title 11, United States Code, is amended by adding at the end the following:*

*"(3) In this section, the term 'charitable contribution' means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—*

*"(A) is made by a natural person; and*

*"(B) consists of—*

*"(i) a financial instrument (as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986); or*

*"(ii) cash.*

*"(4) In this section, the term 'qualified religious or charitable entity or organization' means—*

*"(A) an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or*

*"(B) an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.".*

*SEC. 3. TREATMENT OF PRE-PETITION QUALIFIED CHARITABLE CONTRIBUTIONS.*

*(a) IN GENERAL.—Section 548(a) of title 11, United States Code, is amended—*

*(1) by inserting "(1)" after "(a)";*

*(2) by striking "(1) made" and inserting "(A) made";*

*(3) by striking "(2)(A)" and inserting "(B)(i);*

*(4) by striking "(B)(i)" and inserting "(ii)(I)";*

*(5) by striking "(ii) was" and inserting "(II) was";*

*(6) by striking "(iii)" and inserting "(III)"; and*

*(7) by adding at the end the following:*

*"(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—*

*"(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or*

*"(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.".*

*(b) TRUSTEE AS LIEN CREDITOR AND AS SUCCESSOR TO CERTAIN CREDITORS AND PURCHASERS.—Section 544(b) of title 11, United States Code, is amended—*

*(1) by striking "(b) The trustee" and inserting "(b)(1) Except as provided in paragraph (2), the trustee"; and*

*(2) by adding at the end the following:*

*"(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.".*

*(c) CONFORMING AMENDMENTS.—Section 546 of title 11, United States Code, is amended—*

*(1) in subsection (e)—*

*(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and*

*(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)";*

*(2) in subsection (f)—*

*(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and*

*(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)"; and*

*(3) in subsection (g)—*

*(A) by striking "section 548(a)(1)" each place it appears and inserting "section 548(a)(1)(A)"; and*

*(B) by striking "548(a)(2)" and inserting "548(a)(1)(B)".*

*SEC. 4. TREATMENT OF POST-PETITION CHARITABLE CONTRIBUTIONS.*

*(a) CONFIRMATION OF PLAN.—Section 1325(b)(2)(A) of title 11, United States Code, is amended by inserting before the semicolon the following: ", including charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made".*

*(b) DISMISSAL.—Section 707(b) of title 11, United States Code, is amended by adding at the end the following: "In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).".*

*SEC. 5. APPLICABILITY.*

*This Act and the amendments made by this Act shall apply to any case brought under an applicable provision of title 11, United States Code, that is pending or commenced on or after the date of enactment of this Act.*

*SEC. 6. RULE OF CONSTRUCTION.*

*Nothing in the amendments made by this Act is intended to limit the applicability of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2002bb et seq.).*

The SPEAKER pro tempore (Mr. PEASE). Pursuant to the rule, the gentleman from Pennsylvania (Mr. GEKAS) and the gentleman from New York (Mr. NADLER) each will control 20 minutes.

The Chair recognizes the gentleman from Pennsylvania (Mr. GEKAS).

GENERAL LEAVE

Mr. GEKAS. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to revise and extend their remarks on the bill under consideration.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. GEKAS. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I urge adoption of this legislation and wish to set the stage for some of the comments that we will hear during the debate on this measure.

This issue was brought to our attention by the gentlewoman from Idaho (Mrs. CHENOWETH) and the gentleman from California (Mr. PACKARD) on two separate pieces of legislation that dealt with the same issue. Their legislative efforts came from different angles and from different perspectives, but the ultimate purpose was the same: to try to rectify a situation in which a contributor to a charitable organization, for the purpose of our hypothetical say to a church organization, makes a contribution, he subsequently files for bankruptcy, and a decision is made by the bankruptcy court and direction is given to the bankruptcy trustee to recover that amount paid by contribution to the church because it came within a certain period of time and, therefore, was not subject to be clear of the bankruptcy laws. So now we have the strange situation of a bankruptcy trustee having to assert a claim against a church.

Mr. Speaker, that seemed unseemly to a great number of people. The gentlewoman from Idaho and the gentleman from California took to the legislative process to try to bring about a change. Hence their legislation, hence the action of the Committee on the Judiciary, and we have arrived at this point.

What we have done ultimately is to mirror, or try to mirror as much as we can, the Senate version of this same issue in legislation that they have passed so that we can be better prepared when the time comes for ultimate decision to be made by a conference in the two bodies. That is why we have come to the floor at this moment with the vehicle being H.R. 2604.

Mr. Speaker, after the gentleman from New York (Mr. NADLER) presents his opening statement, I will yield to these two Members so that they can fully explain the contents of the legislation, the purpose, et cetera.

Mr. Speaker, I urge adoption of H.R. 2604, the "Religious Liberty and Charitable Donation

Protection Act of 1998" This legislation, introduced by my colleague, Mr. PACKARD, on October 2, 1997, has as of today more than 120 bipartisan co-sponsors, was reported out of the Judiciary Committee without objection.

H.R. 2604, with amendment, which is before you for consideration today, contains one substantial change from the bill as reported by the Judiciary Committee which is in accord with the members of the other body. The additional provision it contains prevents creditors from using remedies available under state law to avoid transfers of religious or charitable contributions. H.R. 2604, as amended, is now identical to its Senate counterpart, S. 1244, which passed the other body on a vote of 100 to 0 on May 13, 1998. Favorable action today in this body can send this legislation to the President for his approval.

The principal component of H.R. 2604 protects certain prepetition charitable contributions made by an individual debtor to qualified religious or charitable entities within one year preceding the filing date of the debtor's bankruptcy petition from being subsequently avoided by a bankruptcy trustee under Section 548 of the Bankruptcy Code. The bill defines "charitable contribution" and "qualified religious or charitable entity or organization" by reference to applicable provisions of the Internal Revenue Code. In addition, its sets certain limits on the amount of charitable contributions that would be exempt from Section 548.

Important policy considerations support this bill. Voluntary donations should be treated differently than other types of property transfers under the Bankruptcy Code. The inherent nature of charitable contributions is that they are made specifically without the intent of receiving anything in return. This principal is recognized in the Internal Revenue Code's provisions concerning the deductibility of certain charitable contributions.

Under current law, the courts often conduct a very fact-specific analysis to determine whether a debtor received reasonably equivalent value in exchange for a charitable contribution. In the religious context, courts consider, for example, whether the debtor received certain services from the religious entity, such as counseling, in exchange for his or her donation. This analysis essentially places courts in the untenable position of having to value spiritual benefits and has led to disparate case law development.

Other policy considerations favoring the exemption of charitable contributions from the purview of Section 548 include the fact that religious and charitable organizations provide valuable services to society and serve the common good. Another consideration is the fact that most religious and charitable organizations simply lack the funds to litigate a recovery action filed a bankruptcy trustee under Section 548 and therefore must simply return the funds received. Particularly in light of the longer reachback period permitted under state law made applicable under Section 544(b) of the Bankruptcy Code, a charitable organization or religious entity may have to return funds it received from a debtor over a period extending several years.

The bill also addresses problems presented by the current unclear state of the law that exists in light of a recent decision by the Supreme Court that places the continuing validity of the Religious Freedom Restoration Act in doubt.

It is important to keep in mind that H.R. 2604 is not intended to diminish any of the protections against prepetition fraudulent transfers available under section 548 of the Bankruptcy Code. First, it applies to transfers that a debtor makes on an aggregate basis during the one-year reachback period preceding the filing of the debtor's bankruptcy case. Second, if a debtor, on the eve of filing for bankruptcy relief, suddenly donates 15 percent of his or her gross income to a religious organization, the debtor's fraudulent intent, if any, would be subject to scrutiny under section 548(a)(1) of the Bankruptcy Code. This fifteen percent "safe harbor" merely shifts the burden of proof and limits litigation to where there is evidence of a change in pattern large enough to establish fraudulent intent.

In addition, H.R. 2604 protects the right of certain debtors to tithe or make charitable contributions after filing for bankruptcy relief. This protection is required because some courts have held that tithing is not a reasonably necessary expense or have dismissed these debtors' bankruptcy cases on the ground that such tithing constituted a "substantial abuse" under section 707(b) of the Bankruptcy Code.

For all of these laudatory reasons, I urge the adoption of H.R. 2604, as amended.

Mr. Speaker, I reserve the balance of my time.

Mr. NADLER. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I want to begin by thanking the honorable gentleman from California (Mr. PACKARD), my friend, for originally introducing this legislation. I also thank the honorable gentleman from Pennsylvania (Mr. GEKAS), for bringing this legislation forward.

Mr. Speaker, given the spirited debates we have been having on our subcommittee and on the full committee on certain other bankruptcy legislation the gentleman is sponsoring, I am glad we have been able to work together to develop this bill and to bring it to the floor as bipartisan legislation today.

This bipartisan legislation would protect religious and other charitable institutions that receive donations from individuals who later declare bankruptcy, and would permit debtors in bankruptcy to continue to make donations to such organizations of up to 15 percent of their gross annual income.

This bill is needed to address a problem that originated with the Supreme Court's decision in 1990 in Employment Division versus Smith, which said that the government may impose substantial burdens on an individual's free exercise rights so long as the government does so in a manner that is facially neutral toward religion.

Congress attempted to correct this decision in 1993 by enacting the Religious Freedom Restoration Act, RFRA. The Court of Appeals in the Eighth Circuit ruled in 1996 that RFRA protected tithed donations to a charitable organization from creditors in bankruptcy proceedings.

The following year, last year, the Supreme Court unfortunately struck down RFRA in City of Boerne versus

Florez, and later, in accordance with its decision in Boerne that RFRA was unconstitutional, vacated and remanded the Eighth Circuit decision.

Since the Supreme Court decision struck down RFRA only with respect to State laws, however, it is uncertain today whether RFRA remains good law as applied to Federal statutes such as the Bankruptcy Code. While the Supreme Court may ultimately decide this question, I see no reason to wait for a decision when a simple and straightforward remedy is at hand as to the tithing problem.

This legislation would protect religious and charitable donations in bankruptcy proceedings by clarifying that they are not "fraudulent transfers" within the meaning of the statute. As modified by the Senate language, the legislation also deals with the problem of State fraud statutes which might otherwise, under some circumstances, be used to undercut the Federal protection which I trust we will institute today. So this legislation takes care of that potential problem.

Mr. Speaker, I would like at this time to engage the gentleman from Pennsylvania (Mr. GEKAS) in a colloquy to confirm my understanding of the legislative intent with respect to section 3(a) of this bill which adds a new section 548(a)(2)(A) to title 11 of the U.S. Code. This section provides a safe harbor for qualified contributions of up to 15 percent of the debtor's gross annual income for the year in which such contributions were made. Under the new section 548(a)(2)(B), if the debtor's aggregate donations exceed 15 percent, the debtor would have to establish that the transfer was consistent with his or her prior pattern of charitable giving in order for that donation to be protected.

Mr. Speaker, I would ask the gentleman from Pennsylvania (Mr. GEKAS) to confirm my understanding as set forth in the committee report that the intent of this provision is to protect qualified contributions of up to 15 percent of the debtor's gross annual income in the aggregate for the year in which the contribution was made, and that we do not intend this language to allow multiple contributions to a given organization or to more than one organization which in the aggregate exceed 15 percent of the debtor's gross annual income to be protected. Would the gentleman confirm whether this is his understanding as well?

Mr. GEKAS. Mr. Speaker, will the gentleman yield?

Mr. NADLER. I yield to the gentleman from Pennsylvania.

Mr. GEKAS. Mr. Speaker, I appreciate the opportunity at this juncture to explain in response to the gentleman's question that this legislation is not intended to diminish any of the protections against pre-petition, fraudulent transfers available under section 548 of the Bankruptcy Code.

First, it applies to transfers that a debtor makes, and I emphasize this, on

an aggregate basis during the one year reach-back period to which the gentleman has referred proceeding the filing of the debtor's bankruptcy case.

Second, if the debtor on the eve of filing for bankruptcy relief suddenly donates 15 percent of his or her gross income to a religious organization, the debtor's fraudulent intent, if any, would be subject to scrutiny under section 548(a)(1) of the Bankruptcy Code. This 15 percent safe harbor merely shifts the burden of proof and limits litigation to where there is evidence of a change in pattern large enough to establish fraudulent intent. We hope this satisfies the inquiry that the gentleman has posed.

Mr. NADLER. Mr. Speaker, reclaiming my time, I thank the gentleman very much for his response. Yes, indeed it does satisfy the inquiry. I thank the gentleman for his assistance in clarifying the intent of the legislation and of the Congress in regard to this matter. Mr. Speaker, I urge my colleagues to adopt this legislation.

Mr. Speaker, I reserve the balance of my time.

Mr. GEKAS. Mr. Speaker, I yield 5 minutes to the gentleman from California (Mr. PACKARD).

(Mr. PACKARD asked and was given permission to revise and extend his remarks.)

Mr. PACKARD. Mr. Speaker, I thank the gentleman from Pennsylvania (Mr. GEKAS) for yielding me this time. I would like to take this moment to heartily thank the gentleman from Illinois (Mr. HYDE), chairman of the full Committee on the Judiciary, the gentleman from Pennsylvania (Mr. GEKAS), the chairman of the subcommittee, and the gentleman from New York (Mr. NADLER), the ranking Democrat on the subcommittee, for bringing this bill to the floor today and for their support of the Religious Liberty and Charitable Donations Protection Act which is before us.

Mr. Speaker, in the Old Testament it says, "Will a man rob God? Yet ye have robbed me. But ye say, Wherein have we robbed thee? In tithes and offerings. Bring ye all the tithes into the storehouse, that there may be meat in mine house, and prove me now herewith, sayeth the Lord of Hosts, if I will not open you the windows of heaven, and pour you out a blessing, that there shall not be room enough to receive it."

To many Christians this is a sacred commandment, and they cannot practice their religions unless they can obey this commandment that says they need to bring their tithes to Him.

A person often in times of financial and other problems turns to God and their church for strength and for blessings. To close those windows of heaven and prevent God from pouring out a blessing at the very time that bankrupt families need His blessings would be unconscionable, for the law of the land to prevent a person from being able to practice that part of their religion.

Mr. Speaker, many churches and charitable organizations across this country live from hand to mouth, when what comes into the collection plate on one day is usually spent the next. When a creditor is allowed to sue a church or a charity in order to recover a donation made possibly months or even years earlier, the church or charity is usually put in a position of hardship. What is more, they rarely have the ability or the resources to fight the suit in court. In some cases, that can lead to financial ruin for the church or for the charitable organization.

I do not believe that a church or a charity that receives a tithe or a donation ought to have to check the financial background of the donor before they donate. They certainly should not be penalized for receiving a donation from anybody, but that is exactly what current law requires.

My bill, along with Senator GRASSLEY's bill, S. 1244, would correct this problem. In addition to protecting churches and charities, our bill also assists the individual donor himself. Currently, a person who files for bankruptcy under chapter 13 is not allowed to make charitable contributions or tithes to a church. Amazingly, the court has said that in making this type of contribution, the donor receives nothing of value in return. Mr. Speaker, I cannot accept this. I contribute to my church and I am here to say that I do receive something of significant value, and it is tangible to me, in return.

Under chapter 13, a person can go to a bar, to a beer hall. They can get advice on a 1–900 psychic advice line. They can gamble their money away. They can fill their basement full of alcohol. But they cannot contribute to their church or to a charity. That is unconscionable and ought to be corrected, and this bill will correct that.

I hope and pray that every Member of this House will follow the lead of the Senate. The Senate, when this was called for on a rollcall vote on the floor of the Senate, 100 Senators voted for it. Not a single one voted against it. We hope the House will follow that example.

Again, I thank the gentlemen from Pennsylvania (Mr. GEKAS), the chairman of the subcommittee, and the gentleman from New York (Mr. NADLER), ranking member, for bringing this to the floor of the House today.

Mr. Speaker, I submit the following three letters that deal with this bill for inclusion in the RECORD:

CHRISTIAN LEGAL SOCIETY,
*Annandale, VA, May 13, 1998.*

Re support for H.R. 2604.

Hon. RON PACKARD,
*U.S. House of Representatives,*
*Washington, DC.*

DEAR REPRESENTATIVE PACKARD: The 4,000 member attorneys and law students of the Christian Legal Society unequivocally endorse your "Religious Liberty And Charitable Donation Protection Act," for a number of reasons.

First, your bill would prevent bankruptcy trustees or creditors under section 544 from using state fraudulent transfer laws that allow confiscation of donations going back as far as six years prior to bankruptcy filing. H.R. 2611 does not.

Second, H.R. 2604 ensures the right of Americans to continue to give to their church or charity while they are paying off their debts pursuant to a Chapter 13 plan. Otherwise, religious believers will be barred for years from exercising this form of worship. H.R. 2611 does not address Chapter 13.

Third, H.R. 2604 would protect tithes and offerings received by churches and charities from donors who gave either from a sense of religious obligation or motivation. Some judges will inevitably conclude that the clause in H.R. 2611 that limits protection to gifts made "from a sense of religious obligation" does not extend to the millions of Americans who give not because of a commandment but out of gratitude to God.

Fourth, H.R. 2604 is constitutionally sound. It extends protection to donations given to religious as well as non-religious donees. H.R. 2611 only protects gifts to "a religious group or entity"; consequently, it is likely to be challenged as violative of the First Amendment's prohibition on an establishment of religion.

With the Senate's near unanimous approval today of the identical Grassley language (S. 1244), it is apparent that H.R. 2604 enjoys broad bipartisan support. The Packard-Grassley bill can pass this Congress, providing immediate relief for churches and ministries that are otherwise bound to continue losing in the courts. Unlike H.R. 2611, it would protect debtors in Chapter 13 who wish to continue their donations. Unlike H.R. 2611, H.R. 2604 would prevent the misuse of state laws to confiscate multiple years of giving. And H.R. 2604 would protect far more churches (not just those that require tithing) and would not likely be a target of a lawsuit challenging its constitutionality.

For any and all of these reasons, Christian Legal Society will work for the earlier passage in the House of H.R. 2604.

Respectfully,

STEVEN T. MCFARLAND,
*Director, Center For*
*Law and Religious*
*Freedom.*

P.S. We understand that some may question whether the 15% figure in section 3 of H.R. 2604 is a cap. We believe the answer is clearly "no." Rather than inviting trustees across the country to litigate over whether the tithe was a consistent practice of the donor, H.R. 2604 creates a bright-line test, a "safe harbor" that defuses this issue. Churches would not have to waste precious funds on legal fees defending their offerings in court. It would be clear; if the donations are no more than 15%, then trustee cannot challenge them, unless he has evidence of actual fraud (section 548a(1) would remain available). With the 15% shield, Congress would be clarifying what creditors cannot challenge, not prescribing how much a donor should give. A donor can give more than 15% of his income to charity, but will have to prove that this has been his consistent practice over several years.

SCHOOL OF LAW,
THE UNIVERSITY OF TEXAS AT AUSTIN,
*Austin, TX, May 6, 1998.*

Hon. RON PACKARD,
*Rayburn House Office Building,*
*Washington, DC.*

DEAR REP. PACKARD: The question has arisen whether S. 1244 and H.R. 2604 would protect unincorporated churches. The answer is yes; unincorporated churches would be protected.

These bills protect organizations defined in §170(c)(2) of the Internal Revenue Code,

which includes any "corporation, trust, or community chest, fund, or foundation" organized and operated exclusively for charitable, religious, or other listed purposes. The Internal Revenue Code defines "corporation" to include an "association." 26 U.S.C. §7701(a)(3). An unincorporated association may also be a "fund."

The language of §170(c)(2) dates to shortly after World War I. Related sections drafted more recently use the word "organization," which more obviously includes unincorporated associations. *See, e.g.,* §170b and §§502–511. The implementing regulations under §170 and §501(c)(3) also used the word "organization." 26 C.F.R. §§1.170 and 1.501. "Organization" does not appear to be a defined term. But Treasury Regulations define "articles of organization" in inclusive terms: "The term 'articles of organization' or 'articles' includes the trust instrument, the corporate charter, *the articles of association*, or any other written instrument by which an organization is created." 26 C.F.R. §1.501(c)(3)(b)(2) (emphasis added). "Articles of association" clearly seems designed to include unincorporated associations.

The clearest statement from the Internal Revenue Service appears to be Revenue Procedure 82-2 (attached), which sets out certain rules for different categories of tax exempt organizations. Section 3.04 provides a rule for "Unincorporated Nonprofit Associations." This Procedure treats the question as utterly settled and noncontroversial.

Tax scholars agree that §170 includes unincorporated associations. The conclusion appears to be so universally accepted that there has been no litigation and no need to elaborate the explanation. The leading treatise on tax-exempt organizations states: "An 'unincorporated association' or 'trust' can qualify under this provision, presumably as a 'fund' or 'foundation' or perhaps, as noted, as a 'corporation.'" Bruce R. Hopkins, *The Law of Tax-Exempt Organizations* §4.1 at 52 (7th ed. 1997).

Borris Bittker of Yale and Lawrence Lokken of NYU say: "Since the term 'corporation' includes associations and 'fund or foundation' as used in IRC §501(c)(3) is construed to include trusts, the technical form in which a charitable organization is clothed rarely results in disqualification." Boris I. Bittker & Lawrence Lokken, 4 *Federal Taxation of Income, Estates and Gifts* ¶100.1.2 at 100-6 (2d ed. 1989).

Closely related provisions of the Code expressly cover churches. I.R.C. §170(b)(1) states special rules for a subset of organizations defined in §170(c), including "a church, or a convention or association of churches." I.R.C. §508(c)(1) provides that "churches, their integrated auxiliaries, and conventions or associations of churches" do not have to apply for tax exemption. These provisions plainly contemplate that churches are covered; they also prevent the accumulation of IRS decisions granting tax exempt status to unincorporated churches. These churches are simply presumed to be exempt.

There are tens of thousands of unincorporated churches in America. I am not aware that any of these churches has ever had difficulty with tax exemption or tax deductibility of contributions because of their unincorporated status. I work with many church lawyers and religious leaders, and none of them has ever mentioned such a problem. There are no reported cases indicating litigation over such a problem. If unincorporated churches were having this problem, Congress would have heard demands for constituent help or corrective legislation.

The fact is that legitimate unincorporated churches that otherwise qualify for tax deductibility under §170 and for tax exemption under §501(c)(3) are not rendered ineligible

by their failure to incorporate. There is so little doubt about that that neither Congress, the IRS, nor the courts has ever had to expressly elaborate on the rule that everyone knows. This is a question that can be safely dealt with in legislative history affirming Congress's understanding that unincorporated associations are included in §170(c)(2) and Congress's intention that they be protected by these bills.

I consulted informally with Deirdre Halloran, the expert on tax exempt organizations at the United States Catholic Conference, and with tax professors here and elsewhere, who confirmed these conclusions. Ms. Halloran would be happy to respond to inquiries from your office if you need a second opinion.

Very truly yours,

DOUGLAS LAYCOCK.

---

REV. PROC. 82–2

SECTION 1. PURPOSE

The purpose of this revenue procedure is to identify the states and circumstances in which the Service will not require an express provision for the distribution of assets upon dissolution in an exempt organization's articles of incorporation, trust instrument, or other organizing document to satisfy the "organizational" test in section 1.501(c)(3)-1(b)(4) of the Income Tax Regulations. Also, this procedure provides a sample of an acceptable dissolution provision for organizations that are required to have an express provision for the distribution of assets upon dissolution.

SEC. 2. BACKGROUND

.01 Section 1.501(c)(3)–1(b)(4) of the regulations provides that:

"(4) *Distribution of assets on dissolution.* An organization is not organized exclusively for one or more exempt purposes unless its assets are dedicated to an exempt purpose. An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, by reason of a provision in the organization's articles or by operation of law, be distributed for one or more exempt purposes, or to the Federal government, or to a State or local government, for a public purpose, or would be distributed by a court *to another organization to be used in such manner as in the judgment of the court will best accomplish the general purposes for which the dissolved organization was organized.* However, an organization does not meet the organizational test if its articles or the law of the State in which it was created provide that its assets would, upon dissolution, be distributed to its members or shareholders. [Emphasis added.]

.02 The issue of the applicability of state law in relation to section 1.501(c)(3)–1(b)(4) of the regulations as to a particular organization arises only where the organization itself has not provided for the distribution of its assets upon dissolution in its articles of incorporation, organizing document, or trust instrument. When state law satisfies the provisions of section 1.501(c)(3)–1(b)(4), it is not necessary to require an organization to amend its articles of incorporation or organizing document, or to require a trust to obtain a judicial decree amending its trust instrument, in order to satisfy the organizational test for qualification as an exempt organization described in section 501(c)(3) of the Code, where all the other requirements for exemption are met.

.03 The issue of whether section 1.501(c)(3)–1(b)(4) of the regulations is satisfied under state law can be broken down into four areas according to the type of entity involved:

(1) the *cy pres* doctrine as to *inter vivos* charitable trusts;

(2) the *cy pres* doctrine as to testamentary charitable trusts, which can exist in a particular state by case law and/or by statute;

(3) state corporate law containing statutes that provide for the distribution of assets upon the dissolution of nonprofit corporations; and

(4) state law by court decision or statute relating to unincorporated associations.

Each of these four areas will be treated separately in this revenue procedure.

SEC. 3. GUIDELINES

.01 Inter Vivos Charitable Trusts.

1. Because there is no guarantee under the law of any jurisdiction, except Delaware, that *cy pres* would be used to keep an *inter vivos* charitable trust from failing, any *inter vivos* charitable trust, except in Delaware, should be required to have an adequate dissolution provision in its trust instrument to satisfy the requirements of section 1.501(c)(3)–1(b)(4) of the regulations.

.02 Testamentary Charitable Trusts.

1. The courts in the following states always apply the *cy pres* doctrine or the doctrine of equitable approximation to keep a charitable testamentary trust from failing, and thus section 1.501(c)(3)–1(b)(4) of the regulations with respect to charitable testamentary trusts is satisfied:

Alabama.
Delaware.
Louisiana.
Pennsylvania.
South Dakota.
Virginia.

West Virginia (However, a state court decision has held that the *cy pres* doctrine does not apply to a scientific organization in West Virginia.)

2. The courts in the jurisdictions listed below will apply the *cy pres* doctrine to keep a charitable testamentary trust from failing when the language of the trust instrument demonstrates that the settlor had a general intent to benefit charity, and not merely a specific intent to benefit a particular institution. In such jurisdiction the *cy pres* doctrine may be relied upon by a charitable testamentary trust to satisfy section 1.501(c)(3)–(b)(4) of the regulations only when the settlor has demonstrated a general charitable intent in the language of the trust instrument. Unless the testator manifests a general intent to benefit charity, the Service will require the testamentary charitable trust to provide an express dissolution provision in the trust instrument to satisfy section 1.501(c)(3)–1(b)(4).

Arkansas.
California.
Colorado.
Connecticut.
District of Columbia.
Florida.
Georgia.
Illinois.
Indiana.
Iowa.
Kansas.
Kentucky.
Maine.
Maryland.
Massachusetts.
Michigan.
Minnesota.
Mississippi.
Missouri—MO. ANN. STAT. §352.210.3 satisfies the provisions of section 1.501(c)(3)–1(b)(4) of the regulations while MO. ANN. STAT. §355.230.(3) does not satisfy the requirements.
Nebraska.
New Hampshire.
New Jersey.
New York.
North Carolina.
Ohio.
Oklahoma.
Oregon.

Rhode Island.
Tennessee.
Texas.
Vermont.
Washington.
Wisconsin.

3. Charitable testamentary trusts in the following states need a dissolution provision in the trust instrument to satisfy section 1.501(c)(3)–1(b)(4) of the regulations because these states have either expressly rejected or have never applied the *cy pres* doctrine:

Alaska.
Arizona.
Hawaii.
Idaho.
Montana.
Nevada.
New Mexico.
North Dakota.
South Carolina.
Utah.
Wyoming.

.03 Nonprofit Charitable Corporations.

1. The statutes applicable to nonprofit charitable corporations in the states listed below will satisfy the provisions of section 1.501(c)(3)–1(b)(4) of the Regulations:

Arkansas.
California.
Louisiana.
Massachusetts.
Minnesota.
Missouri.
Ohio.
Oklahoma.

All other states, and the District of Columbia do not have statutes applicable to nonprofit charitable corporations that will satisfy the provisions of section 1.501(c)(3)–1(b)(4). Thus, nonprofit corporations in the eight named states do not need a dissolution provision to satisfy section 1.501(c)(3)–1(b)(4). A nonprofit corporation in a jurisdiction not listed needs an adequate dissolution provision in its organizing document to satisfy section 1.501(c)(3)–1(b)(4).

.04 Unincorporated Nonprofit Associations.

None of the fifty-one jurisdictions provides certainty by statute or case law, for the distribution of assets upon the dissolution of an unincorporated nonprofit association. Therefore, any unincorporated nonprofit association needs an adequate dissolution provision in its organizing document to satisfy the requirements of section 1.501(c)(3)–1(b)(4) of the regulations.

.05 Sample Dissolution Provision.

1 For any organization that needs a dissolution provision in its organizing instrument to satisfy the provisions of section 1.501(c)(3)–1(b)(4) of the regulations, the following language is illustrative of what may be used:

(a) *Upon the dissolution of [this organization] assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future Federal tax code, or shall be distributed to the Federal government, or to a state or local government, for a public purpose.*

.06 Periodic Update.

This Revenue Procedure will be updated periodically as changes in state laws come to the attention of the Service.

———

HOME SCHOOL
LEGAL DEFENSE ASSOCIATION,
*Purcellville, VA, May 8, 1998.*

DEAR SENATOR GRASSLEY AND REPRESENTATIVE PACKARD; I received a copy of the letter from Professor Doug Laycock concerning my question regarding the inclusion of unincorporated associations in S. 1244 and H.R. 2604. His letter more than answers my question.

Although an attorney with substantial constitutional practice, I am not a non-profit tax expert by any means. Doug Laycock has outstanding credentials in all relevant areas and his opinion is conclusive for me.

I would note that the expert commentators he quotes appear to point to different terms in the phrase "corporation, trust, or community chest, fund, or foundation" to include unincorporated churches. Taken literally, unincorporated associations do not fall in any of these categories. Reading laws literally is generally a good idea, but was my mistake on this occasion.

Despite the lack of statutory clarity, the practice of the IRS appears clear. And if an appropriate legislative record is made, this should settle the matter for all judges with the possible exception of Justice Scalia.

Thanks for getting an answer so quickly.

Sincerely,

MICHAEL FARRIS,
*President.*

Mr. GEKAS. Mr. Speaker, I yield 4 minutes to the gentlewoman from Idaho (Mrs. CHENOWETH).

Mrs. CHENOWETH. Mr. Speaker, I rise to engage in a colloquy with the gentleman from California (Mr. PACKARD), my friend and the author of this bill.

As the gentleman knows, I have legislation that also addresses the issue of bankruptcy trustees disgorging from innocent churches the tithes of members who have filed for bankruptcy. I applaud the gentleman's efforts and thank him very much for his hard work.

As we have discussed together numerous times, our primary concern is that anything that we do to address this issue will not lead to the future government regulation of the church and the interference in the free exercise of religion. We have had many discussions over that.

Mr. Speaker, with the passage of H.R. 2064, we provide the Federal Government absolutely no opportunity to extend its reach to regulate churches in this country. I would ask, is that the intent of the gentleman's legislation?

□ 1545

Mr. PACKARD. Mr. Speaker, will the gentlewoman yield?

Mrs. CHENOWETH. I yield to the gentleman from California.

Mr. PACKARD. Absolutely, the gentlewoman is certainly right. I have no intentions in this bill or in any other way for the government to regulate churches.

Mrs. CHENOWETH. Mr. Speaker, I thank the gentleman.

With the passage of H.R. 2604, there is no opportunity to have the Federal Government define tithes or to place a floor or a limit on the amount of tithes that a parishioner can give to his or her church. Is that the gentleman's intent?

Mr. PACKARD. Mr. Speaker, that is certainly my intent.

Mrs. CHENOWETH. And, Mr. Speaker, it is my understanding of the intent of H.R. 2604 that we are not including churches in the same legal classifications as 501(c)(3)s, which are an artificial creation of the State, while the churches are a creation of God. Is this the intent of H.R. 2604?

Mr. PACKARD. Mr. Speaker, the gentlewoman is correct.

Mrs. CHENOWETH. Lastly, Mr. Speaker, in solving this problem between churches and the bankruptcy courts, we are not intending the Federal Government to be involved in any way in overriding scripture or taking away the autonomy and the free exercise of religion in America's churches. Is this the intent of H.R. 2604?

Mr. PACKARD. Mr. Speaker, if the gentlewoman will continue to yield, it is certainly the intent of the bill.

Mrs. CHENOWETH. Mr. Speaker, I want to thank the gentleman from California (Mr. PACKARD) for all of his hard work on this issue. I also want to thank his staff for their hard work. The gentleman is a true champion of religious freedom, and he has my deepest respect and admiration. I want to thank the gentleman and my friend from California.

I also join with the gentleman from California (Mr. PACKARD) in thanking the gentleman from Illinois (Mr. HYDE), the gentleman from Pennsylvania (Mr. GEKAS) and the ranking member, the gentleman from New York (Mr. NADLER).

Mr. PACKARD. Mr. Speaker, if the gentlewoman will continue to yield, I want to personally thank her for her leadership on this issue. She wrote a bill that is very similar and I think it has the same basic goals. I applaud the gentlewoman for that. I have sponsored her bill. It is just that this was the bill that moved through the committee structure. I thank the gentlewoman very much.

Mr. NADLER. Mr. Speaker, I yield myself such time as I may consume.

I simply wanted to make a number of observations on this bill.

One, this bill does afford to religious institutions and to nonreligious charitable institutions the same protection. If someone in good faith gives a charitable contribution, whether to a church or the American Cancer Society, the trustee in bankruptcy, if the person subsequently declares bankruptcy, should not go into the church or to the Cancer Society or the Lung Society, whatever it may be, and try to get them to repay the money. That is what this bill does. It sets up those protections.

The second thing I want to say, in light of what I said earlier about the history of this bill, the religious liberty protections, is that some of us in this House are very strong advocates of separation of church and State. I will be opposing the so-called Istook amendment on the floor later in the week. We do believe very strongly in the separation of church and State, but we also believe that government should not be hostile to religion and government should be accommodating to people with religious beliefs and also to people with charitable intentions, and this legislation is very much in that direction.

I think no matter what position someone may take on some of the

other legislation such as the Istook amendment, we can all unite in supporting this type of legislation which does not breach the will of separation of church and State but says that the freedom to contribute money to the church or to the synagogue or the mosque or to the nonreligious charitable institution should not be violated and that government should not be hostile to these institutions.

Again, I thank my colleague from Pennsylvania and my colleague from California for their leadership in bringing this bill to the floor. I urge all my colleagues to vote for it.

Mr. Speaker, I reserve the balance of my time.

Mr. GEKAS. Mr. Speaker, I yield 2 minutes to the gentleman from Indiana (Mr. SOUDER).

Mr. SOUDER. Mr. Speaker, I thank the chairman for yielding me this time and commend the gentleman from California (Mr. PACKARD) for his leadership in this important area of religious liberty and charitable contributions. There is nothing more important to our society than trying to strengthen the voluntary time and money commitments as an alternative, as a supplement to the efforts that government and other organizations make in their communities.

As has been pointed out, I am sure, this legislation is particularly needed to protect religious freedom in this country because of the Crystal Evangelical Free Church in Minneapolis, Minnesota, which has had a prolonged legal fight for over 6 years in an effort to prevent the church from being forced to return money which had been regularly tithed by a parishioner who subsequently filed for bankruptcy.

At the lower court, a Federal bankruptcy trustee recaptured $13,500 in past tithes from the Minnesota congregation. The church appealed the ruling and the Eighth Circuit Court vacated the decision, ruling that the Religious Freedom Restoration Act, RFRA, passed by this Congress, prevented bankruptcy trustees from voiding debtor's tithes to their church as fraudulent transfers.

Unfortunately, as a result of the Supreme Court's decision on June 25, 1997, that RFRA was unconstitutional as applied to the States. The Eighth Circuit was required to vacate its earlier decision on behalf of the church and reconsider its ruling in light of the Supreme Court.

The tragic result is that churches and charities around this country are now vulnerable to aggressive bankruptcy lawyers and other creditors while, at the same time, we are allowing people to take cruises, gamble, even call psychic hotlines, but denying them the right to exercise their faith through contributing to charities and/or other, as the gentleman from New York (Mr. NADLER) pointed out, other charities, not just religious based.

I believe that this situation is intolerable. It violates the first amendment

religious clauses of the Constitution, while encouraging an outbreak of bankruptcy litigation against churches and other charities. This bill provides an excellent resolution to a serious threat to religious freedom and charities across the board.

The full text is also included in the community renewal legislation which I support along with members of the Renewal Alliance.

I once again congratulate the chairman on his leadership.

Mr. GEKAS. Mr. Speaker, I yield 2 minutes to the gentleman from Utah (Mr. CANNON), a member of the Committee on the Judiciary.

Mr. CANNON. Mr. Speaker, one of the common threads throughout the American experience is the strong yearning for religious liberty. It is what brought the Puritans to Plymouth Rock, the Mennonites to Lancaster County and the Mormons to Utah. It is part of what we are as Americans.

Protection of religious expression is a bedrock principle of the Constitution enshrined in the very first amendment to the Bill of Rights. The freedom to fully participate in religion includes the right to make offerings.

Sometimes those who make contributions will fall into financial problems and end up before the local bankruptcy court. Over the past few years bankruptcy courts with neither divine guidance nor the direction of Congress have struggled with reconciling competing interests of creditors and churches. In my view, it is inappropriate for the bankruptcy court system to force religious denominations to disgorge goodfaith offerings or tithes in order to comply with rigid formulas.

S. 1244 seeks to resolve this by establishing a simple formula: Religious contributions by a debtor, if consistent with past practice or if totaling less than 15 percent of gross income, shall not be reachable by a creditor in the context of bankruptcy.

In a sense, this measure follows Christ's admonition to render therefore unto Caesar the things that are Caesar's and unto God the things which are God's. It avoids the effect of our current course that puts Federal bankruptcy court judges in the position of knocking on the doors of our churches wearing the hat of the repo man and demanding the return of tithes, offerings and other contributions.

I compliment the gentleman from California (Mr. PACKARD) and the gentleman from Pennsylvania (Mr. GEKAS) for their hard work and encourage a yes vote.

Mr. GEKAS. Mr. Speaker, I yield back the balance of my time.

Mr. NADLER. Mr. Speaker, I yield 1 minute to the gentleman from Texas, Mr. BENTSEN.

(Mr. BENTSEN asked and was given permission to revise and extend his remarks.)

Mr. BENTSEN. Mr. Speaker, I rise in strong support of the bill. I appreciate the sponsors for doing this.

I had a church in Baytown, Texas, in my district which has experienced a problem with the current law. I appreciate the sponsors of the bill for correcting this situation. I hope the other body takes it up, and it is passed and signed and corrected.

Mr. BENTSEN. Mr. Speaker, I rise as a cosponsor and strong supporter of H.R. 2604, the Religious Liberty and Charitable Donation Protection Act.

This legislation provides much-needed protection to churches and other charitable organizations by preventing creditors from attempting to seize tithes and other donations made by individuals who later file for bankruptcy. Business and individuals should have the right to vigorously pursue the repayment of bad debts. But they should not have the right to reach into church offering plates and the limited budgets of charities providing invaluable services.

I know from the experience of a church in my district, the Cedar Bayou Baptist Church in Baytown, how harmful current law can be. Cedar Bayou was sued by creditors in 1995 and in September of 1997, the church was ordered to return $23,000 in tithes given by a member who later declared bankruptcy. The church has run up more than $7,000 in legal bills defending itself in court and expects the costs to rise even higher as it proceeds with an appeal of its case. Other churches across the country have incurred even higher costs, with one church in Minnesota spending $280,000 on legal fees in a case that reached the U.S. Supreme Court.

Unfortunately, the courts have ruled that tithes and donations are not protected from bankruptcy proceedings and instead are considered fraudulent transfers under current bankruptcy law. So there is an urgent need for this legislation.

This legislation provides much needed protection for houses of worship and charities. Our churches, synagogues, and charities often operate on small budgets and depend on donations for basic operations and services. They should not have to pay the price for someone else's financial problems.

In addition, this legislation also would allow debtors to make a charitable contribution of up to 15 percent under their Chapter 13 bankruptcy protection budget plans. I believe it is appropriate that we give people the peace of mind that, in the event of personal financial difficulties, they can continue to contribute to their favorite church or charity.

I urge approval of this important legislation to protect our charities and houses of worship.

Ms. JACKSON-LEE of Texas. Mr. Speaker, I rise today in support of H.R. 2604, the Religious Liberty and Charitable Donation Protection Act of 1997. First of all, I am glad that we are considering this bill that I think, in some part, affects all of us. The important question that rests before us today is not simply whether our bankruptcy laws, as they stand, are effectively negating the protections for religious freedom afforded by the 1st Amendment of our Constitution, but whether this Congress will continue to be a strong defender of civil and Constitutional rights.

Although we often do so, the Constitution and the rights it extends to the citizens of this country is something that we must not take for granted. According to Judge Alphonzo Taft, father of President and Chief Justice William

Howard Taft, "The ideal of our people as to religious freedom is absolute equality under the law of all religious opinions and sects * * * the government is neutral and while protecting all, it prefers none and disparages none."

The right to express one's religious beliefs freely, as long as their expression does not harm others, is a fundamental part of the American experience. Those who came to this country found the early American colonies nearly four centuries ago, did so in order to escape the bitter sting of religious persecution. So it is no surprise that the first Amendment to the Constitution crafted by the descendants of these brave trailblazers was an attempt to ensure free religious expression. Although at times it is difficult to see, as Americans, we are the products of a great legacy of freedom. A legacy that we, as Members of the United States Congress, have been duly empowered to continue on the people's behalf.

However, in large part, the lasting impact of the 105th Congress, on the people that we have been elected to serve, still remains to be determined. One thing is for sure, whether we are Democrat or Republican, liberal or conservative, male or female, is the fact that the Members of this Congress have a sacred duty to be vigilant defenders of the public good. I believe that a vote of confidence, at least, for the civil libertarian spirit of H.R. 2604, the Religious Liberty and Charitable Donation Protection Act is a necessary step in the right direction. As a proponent of freedom, I can say without reservation that this bill cuts to the heart of what our Constitution and country are really all about.

However, at another level, this bill reminds us of the challenge before us to be at the forefront of the many sorely-needed reforms to our consumer and commercial bankruptcy laws. H.R. 2604, of which I am a co-sponsor, seeks to protect any religious and charitable contribution of a debtor made within one year of their filing for bankruptcy from possible recovery by a Trustee or creditor. Essentially, a Chapter 13 participant can be barred from tithing to their local church if their creditors object to the addition of this gift to their debt restructuring plan. Additionally, in Chapter 7 cases, religious contributions can be used as suitable basis to dismiss a debtor's case on the grounds that they are substantially abusing the Chapter's many favorable bankruptcy provisions. At some point, this subtle form of religious persecution must stop.

Especially at this time when several other sections of Title 11 of our Federal Code are under serious legislative review by this Congress, efforts to provide protection for the charitable and religious donations of debtors are particularly important. If any of the current legislative initiatives that encourage debtors to enter into Chapter 13 recommitment plans are passed, without first enacting these necessary protections for the religious contributions of debtors, then this growing deficiency in our bankruptcy laws will surely be exacerbated. For all of these reasons, I urge all of my colleagues to please support H.R. 2604.

Mr. NADLER. Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore (Mr. PEASE). The question is on the motion offered by the gentleman from Pennsylvania (Mr. GEKAS) that the House suspend the rules and pass the bill, H.R. 2604, as amended.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the bill, as amended, was passed.

A motion to reconsider was laid on the table.

Mr. GEKAS. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the Senate bill (S. 1244) to amend title 11, United States Code, to protect certain charitable contributions, and for other purposes, and ask for its immediate consideration.

The Clerk read the title of the Senate bill.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

The Clerk read the Senate bill, as follows:

S. 1244

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Religious Liberty and Charitable Donation Protection Act of 1998".

SEC. 2. DEFINITIONS.

Section 548(d) of title 11, United States Code, is amended by adding at the end the following:

"(3) In this section, the term 'charitable contribution' means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—

"(A) is made by a natural person; and

"(B) consists of—

"(i) a financial instrument (as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986); or

"(ii) cash.

"(4) In this section, the term 'qualified religious or charitable entity or organization' means—

"(A) an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or

"(B) an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.".

SEC. 3. TREATMENT OF PRE-PETITION QUALIFIED CHARITABLE CONTRIBUTIONS.

(a) IN GENERAL.—Section 548(a) of title 11, United States Code, is amended—

(1) by inserting "(1)" after "(a)";

(2) by striking "(1) made" and inserting "(A) made";

(3) by striking "(2)(A)" and inserting "(B)(i);

(4) by striking "(B)(i)" and inserting "(ii)(I)";

(5) by striking "(ii) was" and inserting "(II) was";

(6) by striking "(iii)" and inserting "(III)"; and

(7) by adding at the end the following:

"(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—

"(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or

"(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.".

(b) TRUSTEE AS LIEN CREDITOR AND AS SUCCESSOR TO CERTAIN CREDITORS AND PUR-

CHASERS.—Section 544(b) of title 11, United States Code, is amended—

(1) by striking "(b) The trustee" and inserting "(b)(1) Except as provided in paragraph (2), the trustee"; and

(2) by adding at the end the following:

"(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.".

(c) CONFORMING AMENDMENTS.—Section 546 of title 11, United States Code, is amended—

(1) in subsection (e)—

(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and

(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)";

(2) in subsection (f)—

(A) by striking "548(a)(2)" and inserting "548(a)(1)(B)"; and

(B) by striking "548(a)(1)" and inserting "548(a)(1)(A)"; and

(3) in subsection (g)—

(A) by striking "section 548(a)(1)" each place it appears and inserting "section 548(a)(1)(A)"; and

(B) by striking "548(a)(2)" and inserting "548(a)(1)(B)".

SEC. 4. TREATMENT OF POST-PETITION CHARITABLE CONTRIBUTIONS.

(a) CONFIRMATION OF PLAN.—Section 1325(b)(2)(A) of title 11, United States Code, is amended by inserting before the semicolon the following: ", including charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made".

(b) DISMISSAL.—Section 707(b) of title 11, United States Code, is amended by adding at the end the following: "In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of 'charitable contribution' under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).".

SEC. 5. APPLICABILITY.

This Act and the amendments made by this Act shall apply to any case brought under an applicable provision of title 11, United States Code, that is pending or commenced on or after the date of enactment of this Act.

SEC. 6. RULE OF CONSTRUCTION.

Nothing in the amendments made by this Act is intended to limit the applicability of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2002bb et seq.).

The Senate bill was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

A similar House bill (H.R. 2604) was laid on the table.

---

TICKET TO WORK AND SELF-SUFFICIENCY ACT OF 1998

Mrs. MYRICK. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 450 and ask for its immediate consideration.